### D. A. GARRISON v. THE VERMONT MILLS.

(Filed 14 December, 1910.)

1. **Equitable Liens—Contracts—Possession, Factor's—Liens at Law.**
   Equitable liens arise either from written contracts, which show an intention to charge some particular property with a debt or obligation, or are declared by a court of equity from the facts and circumstances of the case, and do not depend upon possession, as do factors' liens and other liens at law.

2. **Equitable Liens—Form—Equity—Priorities.**
   No especial form or phraseology is necessary to create an equitable lien, and a court of equity will look through the form to the substance; and when it appears that the parties intended to charge or pledge property as security to the debt, and the property can be identified, the lien follows, and the court will enforce it against all except those having a superior claim.

3. **Equitable Liens—Acts of Possession—Consent—Creditors—Registration—Principal and Agent.**
   The factor and defendant manufacturing company contracted that the former would advance to the latter three-fourths of the net cash value of the manufactured goods on hand and stored with it, being the value thereof after deducting freights, commis-

154—1

sions, etc., the goods to be billed up to the factor and stored in separate warehouses according to the factor's custom, and insured in his favor. A receiver was appointed for the defendant, but prior thereto, under the arrangement stated, the defendant became indebted to the factor, and the agent of the latter visited defendant's mills in company with its president and other officers, took an inventory of the manufactured goods stored in the basement and warehouse, numbered by bales, pieces, and yards, stated that he took possession for his principal, the factor, and left it in charge of C., as the latter's agent: *Held*, (1) independently of the law regulating factors' liens, this constituted an assertion of control, and a taking of possession, reducing the pledge to the possession of the pledgee before the rights of the creditors under the receivership attached; (2) the undisputed evidence showing that C. had previously left the employment of the defendant, his possession was that of the pledgee; (3) therefore, to enforce the equitable lien against creditors, registration was unnecessary; (4) the factor having the right of possession under the contract, the assent of defendant's officers to his taking possession was unnecessary.

REHEARING of decision reported in 152 N. C., 644.

Appeal by the Cone Export and Commission Company, interpleaders, claiming the fund in hands of the receiver.

The facts found by the referee are substantially as follows: On 15 March, 1906, the Cone Export and Commission Company and the Vermont Mills, Incorporated, entered into a written contract that the Cone Export and Commission Company was to have the exclusive sale of the entire product of the defendant's mills at Bessemer City, N. C., except such goods as it might sell to its own store for sale to its customers. It is further provided in said contract:

"Fourth. The party of the second part, the Cone Company, will advance to the party of the first part, the Vermont Mills, upon their demand, three-quarters of the net cash value of goods on hand stored with the party of the first part. By net cash value is meant the net proceeds after deducting freights, cash, and other discounts, commissions, etc. The goods thus advanced on are to be billed up by the party of the first part to the party of the second part, and are to be stored and put in separate warehouses, as is the present custom of the party of the first

part with their present commission house, and insured for the account of the party of the second part by the party of the first part."

This contract was in force when the receiver was appointed for the mills, and under it the interpleader had advanced the company over $13,000 on the output of the mills to be shipped to it.

The following is taken from the report of the referee:

6. On 15 January, 1907, prior to the appointment of the receiver, one W. B. Vaught, agent of the claimant, visited the mills in company with D. A. Garrison, president of the mills; R. F. Coble, a director and superintendent of the mills; J. H. Wilkins and S. J. Durham, and took an inventory of the cloth already made by the mills; that said cloth was on the looms, some stored in the basement, and some in the warehouse; there was only one warehouse; that said Vaught stated that he took possession of the cloth as the property of said claimant, and appointed said Coble as agent of claimant, to care for and hold said cloth; that these acts and declarations were not assented to by D. A. Garrison, president, for himself or on behalf of the mills; that the cloth was numbered by bales, pieces, and yards; that said cloth remained in its then position until taken charge of by the receiver.

7. That on 15 January, and at the date of the appointment of the receiver, said mills were indebted to claimant, and the claimant held invoices for the goods which were then on the premises of the mills, and said indebtedness was in the nature of advances thereon.

8. That on 26 February, 1907, the receiver and claimant entered into a contract whereby claimant was to dispose of the cloth on hand at the mills at the date of the appointment of receiver, and to account for same, awaiting the legal determination of the ownership thereof.

9. That the net proceeds derived by claimant from sale of said cloth on hand at mills at the date of the appointment of receiver under the contract between receiver and claimant amounted to $4,579.33.

10. That the net proceeds derived by claimant from the sale of cloth in its possession in New York, prior to the appointment of receiver, amounted to $3,337.39.

11. That at the date of the appointment of receiver the mills were indebted to claimant in the sum of $13,387.92.

*King & Kimball and James H. Pou for petitioner, Cone Export Company.*

*Burwell & Cansler and O. F. Mason for receiver, appellee.*

BROWN, J. When this case was determined at the first hearing I fully concurred in the opinion of the Court, that "The Cone Export and Commission Company acquired no lien by virtue of its contract of 15 March, 1906, for that was purely an executory contract that goods should be shipped to said company for sale on commission."

I thought then that it was necessary that the interpleader establish a "factor's lien" for its advances, and that to do so the factor must show actual possession.

A factor's lien arises by operation of the common law, for it is universally recognized that a factor, or commission merchant, without any written or verbal agreement, by the law merchant, has a lien upon the goods consigned to him, *while in his possession,* for all advances made to the consignor. It is purely a possessory lien, and I was of opinion that the manner and circumstances under which the interpleader claimed to have taken possession through its agent Vaught did not give it a factor's lien for advances theretofore made. Subsequent reflection and investigation have convinced me that it was not necessary that the interpleader should assert a factor's lien, for under the fourth section of the contract it had an equitable lien upon the goods which a court of equity will enforce.

While it would appear from the findings that Vaught asserted dominion over the goods and undertook to take possession of them in the name of his principal, yet such actual possession was not necessary to the validity of the interpleader's lien.

Equitable liens do not depend upon possession as do factors' liens and other liens at law. They arise either from a written

contract, which shows an intention to charge some particular property with a debt or obligation, or are declared by a court of equity from the facts and circumstances of a case.

Where there is an intention coupled with a power to create a charge on property, equity will enforce such charge against all except those having a superior claim. Such liens are "simply a right of a special nature over the thing, which constitute a charge or encumbrance upon the thing itself, may be proceeded against in an equitable action, and either sold or sequestered under a judicial decree, and its proceeds in the one case or its rents and profits in the other applied upon the demand of the creditor in whose favor the lien exists. It is the very essence of this condition that while the lien continues the possession of the thing remains with the debtor." 3 Pomeroy Eq. (1 Ed.), sec. 1233. An interesting and learned discussion of the subject is to be found in *Ketchem v. St. Louis,* 101 U. S., 306, where the authorities are collected.

Mr. Loveland in his work on Bankruptcy, p. 600, says: "Liens may be divided into three classes: First, common-law or retaining liens; second, liens created by statute, such as mechanics' liens; third, equitable liens. The term lien is specially applicable to the common-law lien; but it is by analogy generally applied to other cases, where a right to prepayment exists out of a particular property or a particular asset or interest in property, either by contract, expressed or implied, or by the implication of a trust or statute, although the property itself may be in the possession of or vested in the person claiming the lien. Liens of this description are in the nature of equitable charges."

Equitable liens do not depend upon possession, nor, strictly speaking, do they constitute a *jus in re* or a *jus ad rem,* but more properly constitute a charge upon the thing, which can be enforced only in equity jurisdictions. 2 Story's Eq. Juris., sec. 1213; *Peck v. Jenness,* 7 How., 812; *The Menominie,* 36 Fed., 197; *Hydraulic Co. v. Wilson,* 33 N. E., 133.

This principle is recognized in our own Reports in *Arnold v. Porter,* 122 N. C., 242: "Equitable liens do not depend upon possession, as do liens at law. Possession by the creditor is not

essential to his acquiring and enforcing a lien, but the other incidents of lien at common law must exist to constitute an equity lien. In courts of law the term 'lien' is used as synonymous with a charge or encumbrance upon a thing where there is neither *jus in re* nor *ad rem* nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of the property, and to a duty or intention implied on his part to make the property answerable for a specific duty or engagement."

1 Jones on Liens, sec. 27, says: "An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation, or is declared by a court of equity out of the general considerations of right and justice, as applied to the relations of the parties and the circumstances of their dealings."

Mr. Bispham, in his work on Equity, sec. 351, gives substantial reasons for extending the doctrine of equitable liens in mercantile transactions: "Besides the common-law liens, there are certain liens, or rights in the nature of liens, which are wholly independent of possession, which exist only in equity, and of which equity alone can take cognizance. In modern times the doctrine of equitable liens has been liberally extended for the purpose of facilitating mercantile transactions, and in order that the intention of parties to create specific charges may be justly and effectually carried out." No especial form or phraseology is necessary to create this lien. A court of equity will look through the form to the substance, and when it appears that the parties intended to charge or pledge property as security for a debt, and the property can be identified, the lien follows, and the court will enforce it.

As said by *Justice Story* in *Flagg v. Mann,* Federal Cases, No. 4847, "If the transaction resolves itself into a security, whatever may be its form and whatever name the parties may choose to give it, it is in equity a mortgage."

When we turn to the judgments of the English chancellors we find the doctrine of the enforcement of equitable liens upon property in the possession of the debtor fully recognized, broadly construed, and invariably enforced.

In *Legard v. Hodges,* 1 Ves., Jr., 478, *Lord Thurlow* said: "I take this to be a universal maxim, that wherever persons agree concerning any particular subject, that, in a court of equity, as against the party himself, and any one claiming under him voluntarily, or with notice, raises a trust." In the report of that case in 3 Bro. C. C., 531, the *Lord Chancellor* says: "I take the doctrine to be true, that when parties come to an agreement as to the produce of land, the land itself will be affected by the agreement."

Other English cases supporting the contentions of the interpleader are: *In re Music Hall Co.,* 3 D. E. G., J. and S., 147; *Watson v. Duke of Wellington,* 1 Russ. and Myl., 602; *Yeates v. Groves,* 1 Ves., Jr., 279.

We find upon examining the reports of the courts of this country a great variety of cases where equitable liens have been enforced upon property in possession of the debtor, many of them under circumstances where the intention of the parties to charge the property was not so clearly manifested as in this case. *Martin v. Schichtl,* 60 Ark., 595; *Ward v. Stark,* 121 S. W., 382; *Pinch v. Anthony,* 8 Allen (Mass.), 536; *Bell v. Pelt,* 51 Ark., 433; *Daggett v. Rankin,* 31 Cal., 327; *Wayt v. Carwithen,* 21 W. Va., 520; *Knott v. Mfg. Co.,* 30 W. Va., 795; *Person v. Obertenffer,* 59 How. Pr., 339; *Hovey v. Elliott,* 118 N. Y., 124; *Wilde v. Watts,* 138 Fed., 432; *Fidelity Ins. Co. v. Ry. Co.,* 11 S. E., 58; *Goodnough v. Galloway,* 156 Fed., 510; *Feeley v. Bryan,* 47 S. E., 307; *Reardon v. Higgins,* 79 N. E., 210; *Burdon Central Sugar Co. v. Ferris Sugar Co.,* 78 Fed., 417; *Donald v. Hewitt,* 33 Ala., 534; *Kilbourn v. Wiley,* 83 N. W., 99.

An instructive case is *Hurley v. R. R.,* 213 U. S., 126, on all-fours with the case at bar, in which the Supreme Court of the United States held in 1908 that "an advance payment for coal yet to be mined may be a pledge on the coal, and in that event, as in this case, the trustee in bankruptcy takes the mine subject to the obligation to deliver the coal as mined to the extent of the advancement." In delivering the opinion of the Court, *Mr. Justice Brewer* says: "Equity looks at the substance and not at the form. That the coal for which this money was ad-

vanced was not yet mined, but remained in the ground to be mined and delivered from day to day, as required, does not change the transaction into one of an ordinary independent loan on the credit of the coal company or upon express mortgage security. It implies a purpose that the coal as mined should be delivered, and is, from an equitable standpoint, to be considered as a pledge of the unmined coal to the extent of the advancement. The equitable rights of the parties were not changed by the commencement of bankruptcy proceedings. All obligations of a legal and equitable nature remained undisturbed thereby. If there had been no bankruptcy proceedings, the coal as mined was, according to the understanding of the parties, to be delivered as already paid for by the advancement."

In *Hanselt v. Harrison,* 105 U. S., the creditor had advanced money for the purpose of purchasing skins to be tanned and finished. The creditor claimed and was given an equitable lien by reason of making the advances under the agreement. The discussion by *Mr. Justice Matthews* is quite applicable to the case at bar, as is also the opinion of the Court by *Mr. Justice White* in *Walker v. Brown,* 165 U. S., 654; *Burden Sugar Ref. Co. v. Payne,* 167 U. S., 127; *Carr v. Hamilton,* 129 U. S., 252; *Bank v. Yardley,* 165 U. S., 634.

While I have discussed the doctrine of equitable liens, equitable rights, and equitable mortgages, and have used those terms, it is for the purpose of showing how equity will look at the substance of any transaction and compel the appropriation of property in accordance with the agreement of parties. I do not wish to be understood, however, as conceding that the contract in this case creates technically a mortgage, or a conditional sale within the purview of our registration laws. In my opinion, the contract is in the nature of an equitable assignment and appropriation of the property to the payment of the advances.

It comes within the principle clearly expressed by *Mr. Justice Hoke* in *Godwin v. Bank,* 145 N. C., 330, in these words: "This case presents no executory agreement to make a pledge

of personal property as security for a past indebtedness, nor is it an executory agreement to give a chattel mortgage or other lien which requires registration either by State law or the Bankruptcy Act. But, as we have endeavored to show, it is a present equitable assignment for a cash. consideration of the bonds, etc."

I concur in the conclusion reached by *Mr. Justice Manning* in his dissenting opinion in this case, 152 N. C., 648, that the principle settled in *Brem v. Lockhart,* 93 N. C., 191, has no application here, as in that case the contract in writing was conceded to constitute a conditional sale requiring registration.

Conceding for sake of argument, however, that the contract under consideration partakes of the nature of a mortgage, a lien, or pledge, the findings show that the interpleader took actual possession and asserted its claim on 14 and 15 January, 1907, some two weeks before creditors sought to subject the property and had a receiver appointed or any rights attached.

Where property is pledged the delivery need not be made contemporaneously with the pledge, and if made thereafter it relates back to the date when the contract or pledge was made. *Chem. Co. v. McNair,* 139 N. C., 326; *Tomlinson v. Bank,* 145 Fed., 824; *Mills v. Virginia Co.,* 164 Fed., 168.

Coble in his testimony states that Vaught assumed control of the goods and turned them over to him, and that thereafter he maintained control, and that he thereafter assembled the goods, which were theretofore some in the different parts of the mill and the greater part in the warehouse. This is in accordance with the findings of the referee. This constitutes an assertion of control and a taking possession and reduced the pledge to the possession of the pledgee before the rights of creditors attached.

The Supreme Court of Massachusetts holds that goods in process of manufacture, but left in the warehouse of the manufacturer, and nominally placed in the custody of one of his employees as agent for pledgee, sufficient. *Sumner v. Hamlet,* 29 Mass., 76.

While there is no finding in respect to Coble's status, the undisputed evidence shows that he had been recently an employee

of the Vermont Mills, but was not at the time in its employ, but had been employed by Cone to take charge of the Southern Cotton Mills.

The fact that Garrison, the president of the corporation, was present and did not affirmatively give his assent, is immaterial.

The right to take possession upon the part of the interpleader being established, it had a right to assert it even against Garrison's protest, much less his mere silence.

That the defendant corporation had appropriated and dedicated all these goods to the payment of the advances is manifest from section 4 of the contract. The money was not advanced upon the credit of the corporation, but practically in partial payment for the goods, which were to be insured in the interpleader's name. They were to be marked and billed to it and stored as its property, and the invoices for the goods had been sent to interpleader before Vaught arrived at the mills. Equity considers these things as done. Under such conditions, the right of the receiver is no greater than that of the insolvent corporation. *Thompson v. Fairbanks,* 196 U. S., 516; 1 Pom. Eq., sec. 155; *Godwin v. Bank, supra.*

In conclusion, I will state that I assume my full share of responsibility for the former decision in this case, and I am glad to have the opportunity to aid in correcting the error which, I am now convinced, was made.

For the reasons given, the Court is of opinion and adjudges that the interpleader, the Cone .Export and Commission Company, is entitled under the terms of the contract to the $4,579.33 in its possession as the proceeds of sale of the goods; the same to be credited upon its debt of $13,387.92 against the Vermont Mills allowed in paragraph 4 of the decree.

That part of the decree of the Superior Court embraced in paragraph 3, which adjudges "that the claimant account for and pay over to the receiver the sum of $4,579.33," is reversed.

The receiver will be taxed with all the costs of this Court.

Petition to rehear allowed.